**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **SVEN PETER MANNSFELD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 10-0553-WS-M** |
| ) | |
| **EVONIK DEGUSSA** ) | |
| **CORPORATION,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This removed action comes before the Court on plaintiff's Motion to Remand (doc. 19).
The parties having extensively briefed the jurisdictional questions presented therein, the Motion
is now ripe for disposition.

**I.     Relevant Procedural History.**

Plaintiff, Sven Peter Mannsfeld, filed a lawsuit in the Circuit Court of Mobile County,
Alabama, against his former employer, which may be generically referred to as "Degussa,"
concerning rights to a pair of job-related inventions that Mannsfeld claims to have developed in
the 1970s and 1980s.[1]  Mannsfeld's pleadings name three Degussa entities as defendants,
including Evonik Degussa Corporation ("EDC"), an Alabama corporation with its principal place
of business in Alabama; Evonik Industries AG ("Evonik Industries"), a German corporation
whose principal place of business is in Germany; and Evonik Degussa GmbH ("EDG"), a
German company with its principal place of business in Germany.  (Amended Complaint, ¶¶ 2-4;

---

[1]        According to the Amended Complaint, the inventions at issue consist of a
bioactive agricultural fertilizer called Degussa Potassium Fertilizer, or DPF (the "DPF
Invention"), and a two-step tri-dimensional catalyst system for the production of granular
methionine (the "Methionine Invention").  (Amended Complaint, ¶¶ 11-12, 43-44.)  Methionine
is an essential amino acid that assists with metabolic function and breaks down fat.  The
Amended Complaint alleges that Degussa has produced and sold DPF and methionine using
Mannsfeld's inventions in this judicial district and elsewhere, and that it continues to do so
today.  (*Id.*, ¶¶ 22, 53.)

Notice of Removal, ¶¶ 29-31.)  Mannsfeld, who has resided in Mobile County continuously for more than 35 years, is an Alabama citizen for diversity purposes.  (Amended Complaint, ¶ 1.)

The Amended Complaint alleges that "Degussa" (apparently one or more of defendants) and Mannsfeld entered into an employment contract in 1964 pursuant to which "the parties agreed that any inventions made by [plaintiff] during his work relationship, and which arose in the course of Plaintiff's work with Degussa, would be governed by and subject to … 'ArbEG,' which is a German law governing the ownership of job-related inventions developed by employees."  (Amended Complaint, ¶ 5.)  Of particular significance to the parties' jurisdictional dispute, Mannsfeld's pleading continues that "'Inventions' within the meaning of ArbEG are those which are eligible for patent or utility model protection, including patentable inventions under German law and/or European law, and U.S. law."  (*Id.*, ¶ 7.)  The Amended Complaint also purports to set forth the specific ArbEG principles by which an employer's and employee's ownership interests in a job-related invention are defined.  (*Id.*, ¶¶ 6, 8-10.)

As to each of the two inventions at issue, the Amended Complaint alleges that Mannsfeld owned and continues to own that invention pursuant to the 1964 agreement and the ArbEG principles that the parties agreed would fix their ownership rights.  On that basis, Mannsfeld seeks a declaratory judgment as to each invention "that Plaintiff is the inventor of the aforesaid [invention]; that Plaintiff is the owner of said invention, and has been since it was invented; and that the Defendants are not the owners of said invention."  (Amended Complaint, ¶¶ 25-26, 56-57.)  Building on the fundamental premise that Mannsfeld owns each invention pursuant to ArbEG, the Amended Complaint also asserts nominally state-law causes of action for breach of contract, conversion, unjust enrichment, and breach of fiduciary duty, essentially alleging that defendants have misappropriated, unjustly profited from, and wrongfully claimed ownership of Mannsfeld's inventions.  (*Id.*, ¶¶ 27-41, 58-72.)  The critical point is that, as postured in the pleadings, all of these claims flow from Mannsfeld's ownership rights in the inventions, as determined by ArbEG principles that he says the parties agreed would govern.

On October 8, 2010, defendants filed a Notice of Removal (doc. 1) removing this entire action to this District Court.[2]  As grounds for removal, defendants invoke both federal question

---

[2]    Initially, the Notice of Removal was filed only by defendants EDC and EDG; however, Evonik Industries later joined in removal after it was served with process.  (*See* doc. (Continued)

jurisdiction pursuant to 28 U.S.C. § 1331 and diversity jurisdiction pursuant to 28 U.S.C. § 1332. With respect to the former, defendants contend that federal question jurisdiction lies because federal patent law creates Mannsfeld's causes of action, and/or his right to relief in those causes of action necessarily depends upon resolution of a substantial question of federal patent law. With respect to the latter jurisdictional foothold, defendants assert that diversity jurisdiction is present because the non-diverse defendant, EDC, was fraudulently joined inasmuch as (i) it is not a party to the 1964 agreement, and (ii) the relevant limitations periods have expired. Plaintiff countered by filing a Motion to Remand in which he insists that federal subject-matter jurisdiction is lacking and that this action is due to be returned to Mobile County Circuit Court for appropriate action.

## II.    Legal Standard for Removal.

It is well settled that "[a] removing defendant bears the burden of proving proper federal jurisdiction." *Leonard v. Enterprise Rent A Car*, 279 F.3d 967, 972 (11th Cir. 2002); *see also King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1171 (11th Cir. 2007) ("Where, as here, the plaintiff asserts diversity jurisdiction, he has the burden to prove that there is diversity."); *Friedman v. New York Life Ins. Co.*, 410 F.3d 1350, 1353 (11th Cir. 2005) ("[i]n removal cases, the burden is on the party who sought removal to demonstrate that federal jurisdiction exists"). Because removal infringes upon state sovereignty and implicates central concepts of federalism, removal statutes are construed narrowly, with all doubts resolved in favor of remand. *See Allen v. Christenberry*, 327 F.3d 1290, 1293 (11th Cir. 2003) ("removal statutes should be construed narrowly, with doubts resolved against removal"); *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999) (explaining that strict construction of removal statutes derives from "significant federalism concerns" raised by removal jurisdiction).[3]

_____

25, at 1.)  Plaintiff has not suggested that Evonik Industries' joinder in removal was untimely or that the removal process was otherwise tainted by procedural (as opposed to jurisdictional) defect.

    [3]    That said, the Eleventh Circuit has admonished lower courts not to distort removal statutes by injecting new restrictions aimed at foreclosing removal where it would otherwise be available. *See Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 766 (11th Cir. 2010) ("While we construe removal statutes narrowly, we do not rewrite them to add restrictions that cannot be found in their language and that would run counter to their purposes.").

"In reviewing matters concerning removal and remand, it is axiomatic that ambiguities are generally construed against removal." *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1177 (11th Cir. 2006) (citation and internal quotation marks omitted). Moreover, it is black-letter law that "[t]he existence of federal jurisdiction is tested at the time of removal." *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1294-95 (11th Cir. 2008). As such, for purposes of the Motion to Remand, the Court focuses on jurisdictional facts as they appeared when defendants filed the Notice of Removal. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1097 n.13 (11th Cir. 1994) ("Jurisdictional facts are assessed on the basis of plaintiff's complaint as of the time of removal.").

## III. Federal Question Jurisdiction.

### A. *Governing Legal Principles.*

"[A] defendant may remove on the basis of federal question jurisdiction only where that question appears on the face of the plaintiff's complaint." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 765 n.20 (11th Cir. 2010); *see also Adventure Outdoors*, 552 F.3d at 1295 ("In determining whether jurisdiction exists under 28 U.S.C. § 1331, a court must look to the well-pleaded complaint alone."); *Ervast v. Flexible Products Co.*, 346 F.3d 1007, 1012 (11th Cir. 2003) (as a general proposition, "unless the face of a plaintiff's complaint states a federal question, a defendant may not remove a case to federal court on this basis"). Nonetheless, even in the absence of a federally created cause of action, "in limited circumstances, federal-question jurisdiction may also be available if a substantial, disputed, question of federal law is a necessary element of a state cause of action." *Jaraith v. Dyer*, 154 F.3d 1280, 1282 (11th Cir. 1998); *see also Adventure Outdoors*, 552 F.3d at 1296 (state-law claims give rise to federal question jurisdiction where they "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities").

### B. *Application of 28 U.S.C. § 1338.*

#### 1. *The* Christianson *Test.*

In removing this action, defendants assert that federal question jurisdiction is presented, notwithstanding the nominally state-law nature of Mannsfeld's claims, pursuant to federal patent law jurisdiction. *See* 28 U.S.C. § 1338 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents …. Such jurisdiction shall

-4-

be exclusive ….”).[4]  The Supreme Court has held that § 1338 jurisdiction extends to any case “in which a well-pleaded complaint establishes either [1] that federal patent law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.” *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).  “In analyzing whether patent law is a necessary element of [plaintiff]'s claims, we are limited to an analysis of [the] well-pleaded complaint,” with any such “arising under” jurisdiction determined “from what necessarily appears in the plaintiff's statement of his own claim.” *ExcelStor Technology, Inc. v. Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1376 (Fed. Cir. 2008) (citations omitted).  “[A]s long as there is at least one alternative theory supporting the claim that does not rely on patent law, there is no ‘arising under’ jurisdiction under 28 U.S.C. § 1338.” *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 685 (2nd Cir. 2009) (citation omitted).[5]

       2.     *Whether Federal Patent Law Creates Plaintiff's Causes of Action.*

In his Motion to Remand, plaintiff asserts that federal patent law does not create his causes of action because the Amended Complaint consists exclusively of state-law claims, with “not one single federal law or patent claim in there.”  (Doc. 20, at 6.)  Defendants dispute this characterization, reasoning that Mannsfeld's declaratory judgment causes of action satisfy the first prong of the *Christianson* test because they seek a declaration of inventorship and “federal patent law creates the cause of action relating to his claim of inventorship.”  (Notice of Removal, ¶ 14.)  Elsewhere, defendants elaborate that, via the declaratory judgment claims, Mannsfeld “expressly seeks a declaration of inventorship under U.S. law” and that those claims “arise under federal law because of Mannsfeld's assertion of inventorship under U.S. law.”  (Doc. 24, at 7, 10

---

    4      Defendants' removal papers and remand briefs repeatedly identify this provision as “35 U.S.C. § 1338.”  Because no such U.S. Code section exists, the Court assumes that defendants actually intended to invoke 28 U.S.C. § 1338.

    5      *See also ClearPlay, Inc. v. Abecassis*, 602 F.3d 1364, 1367 (Fed. Cir. 2010) (“if there is a theory of liability for each of the asserted claims for which it is not necessary to resolve an issue of federal patent law, the district court lacked jurisdiction under section 1338”); *Russo v. Ballard Medical Products*, 550 F.3d 1004, 1009-10 (10th Cir. 2009) (“a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories”) (citations omitted).

n.12.)  Obviously, then, the parties disagree about precisely what relief is sought in the declaratory judgment claims, and whether plaintiff is asking for a declaration of his rights under U.S. patent law.

The text of the Amended Complaint confirms that Mannsfeld is requesting judicial declarations that he "is the inventor of the aforesaid DPF Invention" and that he "is the inventor of the aforesaid Tri-Dimensional Catalyst System for Production of Granular Methionine." (Amended Complaint, ¶¶ 26(a), 57(a).)  But plaintiff's pleadings do not specifically ask that he be declared the "inventor" <u>under U.S. patent law</u> or that the "inventions" be declared patentable <u>under U.S. law</u>.  Rather, the Amended Complaint does not expressly request interpretation or application of federal patent law at all.  Indeed, a straightforward reading of the Amended Complaint is that, pursuant to his employment contract with Degussa, Mannsfeld's declaratory judgment claim for inventorship status turns on application of ArbEG (the German Law of Employee Inventions).  Under ArbEG, the Amended Complaint alleges, "inventions" are defined as "those which are eligible for patent or utility model protection, including patentable inventions under German law and/or European law, and U.S. law."  (Amended Complaint, ¶ 7.)  By all appearances, in asking to be declared the "inventor" of these inventions, Mannsfeld is simply requesting that this Court make a determination that the DPF and Methionine Inventions qualify as "inventions" within the meaning of ArbEG, and parcel out inventorship and ownership rights to those inventions in accordance with ArbEG.  While this inquiry would almost certainly require application of German law, there is no reason to believe that U.S. patent law creates these causes of action or that it would be necessary even to consult U.S. patent law in such an exercise.[6]  Therefore, defendants have not met their burden of showing that these facially state-

_____

[6]        In arguing otherwise, defendants point out that the Federal Circuit "has held that issues of inventorship … present sufficiently substantial questions of federal patent law to support jurisdiction under section 1338(a)."  *Board of Regents, Univ. of Texas System v. Nippon Tel. and Tel. Corp.*, 414 F.3d 1358, 1363 (Fed. Cir. 2005).  This is true, but it does not help defendants here, because Mannsfeld is not seeking a declaration of inventorship under federal patent law in the first place.  Scrutiny of the Amended Complaint reveals that this question simply is not presented.  *See id.* (even though inventorship can support § 1338(a) jurisdiction, such issues were not raised by plaintiffs because patent law issues were not essential to resolution of their tortious interference claim).  Rather, the Amended Complaint confirms Mannsfeld's theory that inventorship will be determined by the ArbEG framework, as required by the 1964 contract, rather than as a matter of U.S. patent law.

law claims are created by federal patent law, so as to support removal under the first prong of *Christianson*. *See ClearPlay, Inc. v. Abecassis*, 602 F.3d 1364, 1367 (Fed. Cir. 2010) (first part of *Christianson* test not satisfied where complaint "is entirely devoted to state law causes of action" not subject to complete preemption).[7]

> 3. *Whether Patent Law is a Necessary Element of Plaintiffs' Claims.*

Defendants also argue that § 1338 jurisdiction is properly exercised under the second part of the test, on the theory that "patent law is a necessary element of one of the well-pleaded claims." *Christianson*, 486 U.S. at 809. As the Federal Circuit has observed, it is "typically the case" that this prong of *Christianson* is "more difficult" to apply. *ClearPlay*, 602 F.3d at 1367. Defendants contend that all of Mannsfeld's claims "necessarily require a determination of whether there are patentable inventions under U.S. law and, if so, whether Mannsfeld is the inventor." (Doc. 24, at 2.) The Notice of Removal states that plaintiff's unjust enrichment and

---

[7]       It bears noting that in the Notice of Removal, defendants predicate their "created by federal patent law" argument solely on plaintiff's claims against EDC, not the other defendants. As to EDC, defendants posit that the 1964 agreement could not apply because EDC was not a party to that contract, and that Mannsfeld's allegations against EDC are confined to activities occurring in the United States. (Notice of Removal, ¶¶ 10-13.) Based on these facts, defendants reason, "With respect to EDC, Mannsfeld's quest for inventorship falls squarely within the first prong of the [*Christianson*] test" because "federal patent law creates the cause of action relating to his claim of inventorship." (*Id.*, ¶ 14.) But a fair reading of the Amended Complaint does not suggest (much less dictate) that Mannsfeld seeks a declaration of inventorship vis a vis EDC on a different legal theory than his requested declarations as to the other defendants. To the contrary, the Amended Complaint alleges that all three defendants are subject to, and bound by, the 1964 agreement, such that ArbEG determines inventorship and ownership rights as to all parties, not just some of them. Plaintiff's theory that ArbEG applies to all defendants pursuant to the contract may or may not be meritorious, but the Court will not ignore the pleadings and superimpose a different theory on Mannsfeld as to one defendant to reach a strained conclusion that federal patent law creates his claims as to that defendant where it obviously does not as to the others. Nothing in the text of the Amended Complaint would support defendants' requested approach, and this Court will not impute unpleaded theories to Mannsfeld to fabricate federal claims that do not exist on the face of the Amended Complaint, in order to prop up removal jurisdiction that is otherwise lacking. In other words, the Amended Complaint eschews any claim that ArbEG does not govern plaintiff's claims against defendant EDC or that the Court should enter a declaratory judgment on inventorship under U.S. patent law (or some state-created patent-like substitute standard) instead. Such a request simply is not there. As such, federal law cannot create Mannsfeld's pleaded causes of action, and this Court will not conjure a federal patent claim that Mannsfeld never pleaded merely because defendants dispute the merits of the actual claims brought against EDC.

conversion claims necessarily require resolution of whether the subject inventions are patentable under U.S. law, whether Mannsfeld invented them, and whether he owns U.S. patent rights to them. (Doc. 1, ¶¶ 16-17, 19-20.) Similarly, defendants' position is that the breach of contract claims "require proof that there was a patentable invention under U.S. patent law that was invented by Mannsfeld," and that the breach of fiduciary duty claims likewise "depend on there being a patentable invention that was invented by Mannsfeld." (*Id.*, ¶¶ 22-24.)[8]

Defendants' premise is clear, to-wit: That plaintiff's claims necessarily hinge on determinations of patentability and inventorship under U.S. patent law. But that is not what the underlying pleadings say. Again, the Amended Complaint is unambiguous that Mannsfeld's causes of action are predicated on the following allegations: (i) Mannsfeld and defendants executed an agreement under which they agreed that his job-related inventions would be governed by ArbEG; (ii) ArbEG applies to "inventions" which are defined as "those eligible for patent or utility model protection, including patentable inventions under German law and/or European law, and U.S. law;" (iii) the DPF and Methionine Inventions are "inventions" that Mannsfeld conceived within the scope of ArbEG; (iv) defendants did not comply with ArbEG's protocols for obtaining ownership of such inventions, but instead misappropriated those inventions for their own use; and (v) Mannsfeld still owns the inventions and has been damaged by defendants' conduct.

As his claims are framed in the Amended Complaint, then, Mannsfeld must prove that these inventions are "eligible for patent or utility model protection, including patentable

---

[8]  Defendants also reiterate their view that Mannsfeld's claims against EDC must arise under U.S. patent law because that defendant was not a party to the 1964 agreement. (Doc. 1, ¶¶ 16, 19, 22, 24.) As explained in footnote 7, *supra*, however, the Court will not rewrite the pleadings or manipulate plaintiff's stated theory of recovery to cram non-federal claims against particular defendants into a federal jurisdictional box. The Amended Complaint does not differentiate among the three defendants as to the contract; therefore, defendants' suggestion that federal jurisdiction is present because plaintiff's claims against EDC are somehow different from those leveled against the other defendants is inconsistent with the terms of the pleadings that control the analysis. By waving aside plaintiff's stated theory of liability against EDC (because they do not think it is valid) in favor of another one that they contend would give rise to federal jurisdiction, defendants improperly conflate merits issues with jurisdictional issues. The Court is constrained not to place cart before horse in a federal question analysis. *See generally American Tobacco*, 168 F.3d at 411 ("the district court should have resolved the issue of subject matter jurisdiction before reaching the merits of any other issue").

inventions under German law and/or European law, and U.S. law," in order for them to be governed by ArbEG per the parties' agreement. To do so, Mannsfeld may show that the DPF and Methionine Inventions are "patentable inventions under … U.S. law," but he certainly is not <u>required</u> to do so. After all, ArbEG would delineate the parties' respective rights to those inventions as long as they are "eligible for patent or utility model production," which would include "patentable inventions under German law and/or European law." Simply put, under plaintiff's theory of liability espoused in the Amended Complaint, defendants' wrongs consist of breaching the 1964 agreement, failing to comply with agreed-upon ArbEG protocols for obtaining ownership of his inventions, and using inventions that Mannsfeld owns under ArbEG. To show that those inventions are subject to ArbEG, Mannsfeld does not necessarily have to establish inventorship or patentability under U.S. patent law, because ArbEG sets forth other legal avenues through which "invention" status may be achieved.

To make this point more concrete, let us examine the declaratory judgment causes of action, wherein plaintiff seeks a declaration that these inventions belong to him and are not owned by defendants. Any such declaration would require a finding that the DPF and Methionine Inventions are "inventions" within the meaning of ArbEG; otherwise, the ArbEG protocols for obtaining ownership would not apply and plaintiff's theory of relief would crumble.[9] To find that they are ArbEG "inventions," a court would not <u>necessarily</u> have to apply U.S. patent law at all, given that ArbEG identifies several other means by which "invention" status may arise. If the DPF and Methionine Inventions are properly termed "inventions" under ArbEG (which may not require consultation of U.S. patent law principles at all), then Mannsfeld is the inventor if he conceived those "inventions." Under this scenario, then, Mannsfeld can obtain the requested declaration of inventorship and ownership status without examination of U.S. patent law. If Mannsfeld can show that he conceived and owns the DPF and Methionine Inventions, then that showing paves the way not only for the declaratory relief he seeks, but also for recovery of damages for defendants' allegedly wrongful use of those inventions on theories of breach of contract, conversion, unjust enrichment, and breach of fiduciary duty. The alleged

---

[9]     The Amended Complaint does not allege any source of Mannsfeld's alleged ownership rights that is independent of ArbEG. As pleaded, then, plaintiff's declaratory judgment claims stand or fall on the notion that he owns those inventions under ArbEG.

wrongful conduct for each of those claims would be defendants' failure to abide by ArbEG procedures, as they had agreed to do, with respect to Mannsfeld's inventions, and their profit from same. None of these claims necessarily turn on U.S. patent law because (i) they all rest on application of ArbEG to define the parties' respective rights and (ii) ArbEG does not mandate consultation of U.S. patent law.

Because there are theories of liability for each of plaintiff's causes of action under which it would be unnecessary to resolve any U.S. patent law issues, those claims do not support federal subject-matter jurisdiction under the second prong of the *Christianson* test. *See ClearPlay*, 602 F.3d at 1367 ("if there is a theory of liability for each of the asserted claims for which it is not necessary to resolve an issue of federal patent law, the district court lacked jurisdiction under section 1338"); *Thompson v. Microsoft Corp.*, 471 F.3d 1288, 1291-92 (Fed. Cir. 2006) (where plaintiff could prevail on claim of unjust enrichment by showing defendant's unauthorized use of proprietary information without proving inventorship under U.S. patent laws, claim did not arise under § 1338).

In so concluding, the Court has considered defendants' counterarguments. For example, defendants maintain that the Amended Complaint pleads that ArbEG invention status depends on "U.S. law governing patentability of inventions … in conjunction with German/European law – not as an alternative to such law." (Doc. 24, at 3-4.) This is an unduly strained and illogical construction of Paragraph 7 of the Amended Complaint, which cannot reasonably (much less necessarily) be read as requiring patentability under <u>both</u> German/European laws <u>and</u> U.S. laws as a prerequisite to "invention" status within the meaning of ArbEG. Rather, one or the other will suffice. Next, defendants insist that Mannsfeld's Motion to Remand contradicts a position he took in related German litigation (doc. 24, at 5); however, no such contradiction is evident in the materials submitted by defendants.[10] Nor is the Court moved by defendants' argument that

---

[10]    In particular, defendants argue that Mannsfeld acknowledged "to the German court that he had to prove the inventions patentable under U.S. law to recover under the ArbEG." (Doc. 24, at 5.) The snippet of evidence proffered on this point reflects merely that Mannsfeld's attorneys made a written reference to "patentability of the inventions …, in particular under German and U.S. patent law." (Doc. 24, Exh. A, ¶ 5.) Patentability under U.S. patent law may indeed be relevant to the application of ArbEG in this case, but it is not <u>necessary</u>, as *Christianson* requires in order for § 1338 jurisdiction to attach. If Mannsfeld shows patentability under German law, for example, then his inventions would be subject to ArbEG, irrespective of (Continued)

"Mannsfeld asks that he be declared the inventor of the invention because he has a contract governed by ArbEG which defines inventions as patentable under U.S. law." (*Id.* at 11.) Defendants misstate the Amended Complaint, which asks that Mannsfeld be declared inventor of the inventions because he has a contract governed by ArbEG which defines inventions as "those which are eligible for patent or utility model protection, including patentable inventions under German law and/or European law, and U.S. law." Contrary to defendants' characterization of the pleadings, patentability under U.S. law is only one of several possible scenarios in which ArbEG invention status could be found; therefore, there are certainly theories of liability supporting plaintiff's claims that do not rely on federal patent law, such that "arising from" jurisdiction under § 1338 is wanting as a matter of law. *See generally Consolidated World Housewares, Inc. v. Finkle*, 831 F.2d 261, 265 (Fed. Cir. 1987) ("That a contract action may involve a determination of the true inventor does not convert that action into one 'arising under' the patent laws.").[11]

Also unavailing is defendants' argument that "ArbEG Itself Requires a Determination Under U.S. Patent Law." (Doc. 24, at 11.) The materials that defendants cite for this proposition (consisting of English translations of ArbEG's Regulations and Guidelines as well as a German treatise) appear to state that if employer and employee have waived their rights to patent protection abroad, then they have created a territory without intellectual property protection.

---

whether they were patentable under U.S. law or not. Nothing in defendants' Exhibit A conflicts with this point. That Mannsfeld may have informed the German court that exploration of patentability under German and U.S. patent laws was appropriate does not in any way undermine his position in this litigation that application of U.S. patent law is not essential for each of his claims and that there are alternative theories supporting his claims that do not rely on U.S. patent law.

[11]    Implicit in defendants' argument is the notion that, because this case implicates questions of inventorship, the Court must disregard the parties' contract (which, again, the Amended Complaint alleges is binding on all defendants) establishing the legal framework under which such questions would be resolved and instead reflexively apply U.S. patent law. However, they have furnished no authority which forbids sophisticated parties from entering into contracts to fix inventorship rights via the law of another country, even if those contracts are to be performed in the United States. As such, the Court cannot blithely endorse the notion that because inventorship is at issue, federal patent law must necessarily decide that question, where the parties' purportedly governing agreement says otherwise.

This is significant, the exhibits continue, because the employee may have no claim to remuneration under ArbEG in that event, as the employer will not be held to a stricter standard than other competitors in that territory. (Doc. 24, Exh. B, ¶¶ 76-78; doc. 8, Exh. G, at 79.) If defendants are correct in this interpretation of German law,[12] then Mannsfeld's claims under ArbEG may fail if both he and defendants waived their rights to patent protection for the inventions in the United States. But that is a question of German law, not U.S. law. Stated differently, under defendants' formulation of these provisions, the critical issue would be whether Mannsfeld and defendants had waived (within the meaning of ArbEG) their right to U.S. patent protection. There is no reason to believe that such a question necessarily turns on "a determination of whether these inventions … could be patented under U.S. law," rather than the objectively verifiable facts of whether they are patented under U.S. law or whether other indicia of a waiver are present. Thus, defendants have established that they may have a defense under German law to Mannsfeld's claims for remuneration under ArbEG; however, they have not shown that U.S. patent law must necessarily be considered to resolve that defense.[13]

Finally, defendants reiterate their popular refrain that removal was appropriate because Mannsfeld's claims against defendant EDC must hinge on federal patent law, inasmuch as EDC did not agree to submit to ArbEG as to Mannsfeld's inventions. (Doc. 24, at 12.) The Court has already considered and rejected this argument *supra*. That rationale will not reproduced in full here. It bears emphasis, however, that the Amended Complaint in no way differentiates among

_____

[12] This Order does not purport to be authoritative on German patent law. Indeed, the undersigned has not independently researched German law on this point, but has simply reviewed the exhibits to confirm whether they support the construction advanced by defendants in furtherance of their obligation to show that federal jurisdiction is proper.

[13] Even if defendants had proven that U.S. patent law is crucial to their ArbEG waiver defense, that showing would be jurisdictionally irrelevant. It is well established that a defendant's legal defenses to a plaintiff's claims generally have no bearing on the question of removal jurisdiction, even if those defenses arise under U.S. patent law. *See, e.g., Christianson*, 486 U.S. at 809 ("case raising a federal patent-law defense does not, for that reason alone, 'arise under' patent law"); *Air Measurement Technologies, Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*, 504 F.3d 1262, 1268 (Fed. Cir. 2007) ("a claim does not arise under the patent laws if a patent issue appears only in a defense to that claim," and this is so "even if both parties admit that the defense is the only question truly at issue in the case") (citations omitted); *Thompson*, 471 F.3d at 1292 (defendant's patent-law defense to plaintiff's state-law unjust enrichment cause of action does not support § 1338 jurisdiction).

the three Degussa entities in theories of liability, but instead alleges that the invention rights between Mannsfeld and each defendant are governed by ArbEg pursuant to the 1964 employment agreement. The Court appreciates defendants' position that such employment agreement does not apply to EDC; however, that litigation position does not justify imputing to Mannsfeld an entirely different unpleaded legal theory for his claims against EDC that necessarily hinges on federal patent law, where the Amended Complaint makes no such allegations. Defendants are attempting to manufacture jurisdiction by trading in what-ifs and possibilities. Simply put, if Mannsfeld wants to rest his claims against EDC on the theory that EDC is bound by the 1964 agreement such that ArbEG applies to its use of Mannsfeld's inventions, then he may do so even if that theory ultimately is deemed to lack merit. *See generally Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004) ("the plaintiff is the master of the complaint, free to avoid federal jurisdiction by pleading only state claims even where a federal claim is also available") (citation omitted). This Court will not second-guess the plaintiff by recasting the complaint as something it is not, as a vehicle for creating federal removal jurisdiction that would otherwise be lacking.

        *4.    Preemption Issues.*

Bound up in the parties' analysis of the second prong of *Christianson* is defendants' recurring theme that federal patent law preempts Mannsfeld's state-law claims for damages (breach of contract, conversion, unjust enrichment, breach of fiduciary duty). (Notice of Removal, ¶¶ 12, 18, 20, 23, 25; doc. 24, at 10.) This argument is not without superficial conceptual appeal. After all, Mannsfeld is seeking royalty-like payments under Alabama law for use of inventions that he never patented in the U.S. Case authorities lend support to defendants' proposition, at least in a general sense. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("States may not offer patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law."); *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377-78 (Fed. Cir. 2005) ("Federal law preempts state law that offers 'patent-like protection' to discoveries unprotected under federal patent law."); *Auburn University v. International Business Machines Corp.*, 2009 WL 3757049, *2 (M.D. Ala. Nov. 9, 2009) ("states may not offer patent-like

protection to intellectual property which would otherwise remain unprotected under federal law").[14]  Nonetheless, the preemption argument does not trigger § 1338 jurisdiction in this case.

A critical aspect of the preemption issue that the parties' briefs overlook (but which the Court addresses *sua sponte* because it bears directly on federal jurisdiction) is the <u>kind</u> of preemption in play.  After all, there is a tremendously important distinction between complete (otherwise known as "super" or "field") preemption, on the one hand, and ordinary (otherwise known as "defensive" or "conflict") preemption, on the other.  Ordinary preemption, unlike complete preemption, "will not provide a basis for removal."  *Dunlap v. G&L Holding Group, Inc.*, 381 F.3d 1285, 1290 n.8 (11th Cir. 2004).[15]  "Complete preemption, as a narrow exception to the well-pleaded complaint rule, carries a higher burden than proving a defense based on preemption."  *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1069 n.1 (11th Cir. 2010); *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 752, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("such complete preemption is not lightly implied"); *Thomas v. U.S. Bank Nat'l Ass'n ND*, 575 F.3d 794, 797 (8th Cir. 2009) ("[c]omplete preemption, as opposed to ordinary or conflict preemption, is rare").  For complete preemption to apply, "it is the cause of action, and not a remedy, that must be preempted."  *Carpenter v. Wichita Falls Independent School Dist.*, 44 F.3d 362, 367 n.2 (5th Cir. 1995).

The obvious question, then, is whether the sort of preemption identified in defendants' Notice of Removal is complete preemption (which could support federal removal jurisdiction) or whether it is the more common ordinary preemption (which merely provides an affirmative defense to a plaintiff's state law claims, and does not support removal jurisdiction).  In the *Ultra-*

---

[14]     In its most clearly articulated form, defendants' stance is that "causes of action dealing with unjust enrichment, conversion, breach of contract and fiduciary duty against EDC are an attempt to obtain patent-like protection for Mannsfeld which is prohibited by *Bonito Boats*."  (Doc. 24, at 10.)  Thus, defendants expressly rely on this line of authority.

[15]     *See also Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1344 (11th Cir. 2009) ("Because conflict preemption is merely a defense, it is not a basis for removal."); *Smith v. GTE Corp.*, 236 F.3d 1292, 1313 (11th Cir. 2001) ("complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court") (citation omitted); *Gutierrez v. Flores*, 543 F.3d 248, 252 n.5 (5th Cir. 2008) ("Complete preemption, which creates federal removal jurisdiction, differs from more common ordinary preemption (also known as conflict preemption), which does not.") (citation omitted).

-14-

*Precision* decision upon which defendants base their preemption arguments, the Federal Circuit explained that any preemption that patent law might exert over the plaintiff's unjust enrichment claims was of the ordinary, non-field variety. The *Ultra-Precision* court reasoned as follows: "Because federal patent law does not provide explicit preemption … and because Congress does not intend to occupy exclusively the field of unjust enrichment law …, we are concerned in this case with only conflict preemption." 411 F.3d at 1377; *see also Russo v. Ballard Medical Products*, 550 F.3d 1004, 1011 (10th Cir. 2008) (reasoning that because Congress has not "evinced an intent to occupy exclusively the entire intellectual property field associated with inventions," court's "only concern in this case is thus narrowed to conflict preemption"); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1333 (Fed. Cir. 1998) ("there is no reason to believe that the clear and manifest purpose of Congress was for federal patent law to occupy exclusively the field pertaining to state unfair competition law," such that "in conjunction with the underlying presumption disfavoring preemption, there is no field preemption of state unfair competition claims that rely on a substantial question of federal patent law"). Following the logic of *Ultra-Precision* and its brethren, the Court observes that there is no reason to believe that Congress intends to occupy exclusively the fields of contract law, unjust enrichment law, conversion law, or fiduciary duty law; therefore, Mannsfeld's claims implicate only ordinary preemption, not complete preemption.[16]

 In short, what we have here is a case in which defendants may or may not have a viable patent law preemption defense to state law causes of action interposed by Mannsfeld. But the

---

[16]  *See, e.g., ClearPlay*, 602 F.3d at 1367 n.1 (claims of tortious interference, breach of contract, and so on were not subject to complete preemption by patent laws, such that state law claims are not converted into federal patent law claims); *Thompson*, 471 F.3d at 1292 & n.2 (plaintiff's unjust enrichment claims not subject to complete preemption by patent law); *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 196 F.3d 1366, 1371 (Fed. Cir. 1999) ("The fraudulent nondisclosure and unjust enrichment causes of action cover a broad range of conduct that does not bear on federal patent policies, and those causes of action are therefore not [completely] preempted by federal patent law."); *Hunter Douglas*, 153 F.3d at 1334-35 (rejecting field preemption analysis for unfair competition claims implicating patent laws as "the better choice in this context, for conflict preemption is a more precise means of determining which state law causes of action are preempted than the blunt tool of field preemption") ; *CardioVention, Inc. v. Medtronic, Inc.*, 430 F. Supp.2d 933, 939 (D. Minn. 2006) ("It is also evident that federal patent law and state unfair competition claims occupy different fields, and thus, field preemption does not apply in this case.").

existence of a preemption defense is insufficient as a matter of law to support § 1338 jurisdiction or to authorize removal of this action to federal court. *See, e.g., Thompson*, 471 F.3d at 1292 (defendants' patent law preemption defense to plaintiff's unjust enrichment claim does not give rise to § 1338 jurisdiction because a case "raising a federal patent-law defense does not, for that reason alone, 'arise under' patent law") (citations omitted). Moreover, the presence of federal patent law questions embedded in a state law cause of action does not trigger federal jurisdiction and does not impede the state court's ability fully and finally to adjudicate the matter. *See Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470, 1475 (Fed. Cir. 1998) ("it is well established that a state court has authority to adjudicate patent questions so long as the action itself does not arise under the patent laws"); *Hunter Douglas*, 153 F.3d at 1334 ("the Supreme Court has repeatedly confirmed that federal patent law issues housed in a state law cause of action are capable of being adjudicated, even if there is no accompanying federal claim").

For all of these reasons, then, the Court concludes that while defendants' objections to plaintiff's claims as seeking "patent-like protection" may (or may not) be meritorious affirmative defenses on a "conflict preemption" theory, they do not automatically transform plaintiff's non-federal causes of action into federal claims on a "field preemption" theory that would support removal jurisdiction. Federal patent law does not occupy exclusively the fields of unjust enrichment law, contract law, conversion law, and fiduciary duty law; therefore, any preemption that may exist here is of the "ordinary" variety and cannot supply the requisite jurisdictional foothold sought by defendants. *See generally Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 14, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (reciting general rule that it is "settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of [ordinary] preemption, even if the defense is anticipated in the plaintiff's complaint").[17]

---

[17] Defendants implicitly acknowledge that the preemption they seek to apply here is the "ordinary" variety rather than "super" preemption, inasmuch as they argue about claims that "conflict with patent law." (Doc. 24, at 14.) Of course, where complete preemption applies, it is of no moment whether a state law principle would be in conflict with federal law or not, because the entire field is preempted. The "conflict with patent law" formulation of defendants' analysis is thus couched purely in terms of ordinary preemption.

**IV.    Diversity Jurisdiction.**

In the alternative to their federal question / § 1338 arguments, defendants contend that this action was properly removed to this District Court pursuant to 28 U.S.C. § 1332 because EDC (the non-diverse, resident defendant) was fraudulently joined, there is complete diversity among the remaining parties, and the amount in controversy exceeds $75,000.  Mannsfeld argues in his Motion to Remand that EDC was not fraudulently joined and that diversity jurisdiction is therefore nonexistent.

> **A.    The Law of Fraudulent Joinder.**

Under 28 U.S.C. § 1332, federal jurisdiction lies where plaintiffs and defendants are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The law is clear that § 1332 demands complete diversity, such that no plaintiff may be a citizen of the same state as any defendant.  *See, e.g., Florence v. Crescent Resources, LLC*, 484 F.3d 1293, 1297 (11th Cir. 2007) (recognizing "necessary corollary" of diversity jurisdiction that "complete diversity of citizenship" is required) (citation omitted); *Legg v. Wyeth*, 428 F.3d 1317, 1320 n.2 (11th Cir. 2005) (Section 1332 "requires complete diversity – the citizenship of every plaintiff must be diverse from the citizenship of every defendant").

"Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity."  *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).  Notwithstanding the complete diversity requirement, a non-diverse defendant who is fraudulently joined does not destroy jurisdiction because his citizenship is excluded from the diversity calculus.  Under well-settled law, a finding of fraudulent joinder is appropriate in the circumstances presented here only if "there is no possibility the plaintiff can establish a cause of action against the resident defendant. … The defendant must make such a showing by clear and convincing evidence."  *Henderson v. Washington National Ins. Co.*, 454 F.3d 1278, 1281 (11th Cir. 2006); *see also Florence*, 484 F.3d at 1299 ("if there is any possibility that the state law might impose liability on a resident defendant under the circumstances alleged in the complaint, the federal court cannot find that joinder of the resident defendant was fraudulent, and remand is necessary").  Thus, "[t]he plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate."  *Triggs*, 154 F.3d at 1287.  The burden on the removing party to prove fraudulent joinder is a "heavy one."  *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997).

In assessing a fraudulent joinder claim, "the district court must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in the plaintiff's favor." *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1380 (11ᵗʰ Cir. 1998).

There is no dispute that both Mannsfeld and EDC are Alabama citizens for diversity purposes. Accordingly, defendants could properly predicate removal jurisdiction on § 1332 only if EDC's citizenship somehow does not count in the diversity analysis (*i.e.*, if EDC was fraudulently joined).[18] Defendants maintain that EDC was fraudulently joined because (i) plaintiff's claims against it are time-barred; and (ii) EDC was not a party to the employment agreement and therefore cannot be liable to Mannsfeld on his stated theory that EDC breached said contract and committed various torts by failing to adhere to agreed-upon ArbEG principles governing ownership of the inventions.

### B. Statute of Limitations and the "Common Defense" Rule.

Defendants' primary fraudulent joinder argument is that Mannsfeld's claims against EDC are barred by applicable statutes of limitations. (Doc. 1, ¶¶ 38-40, 42-44, 49-51, 55-57, 65-66.) The Amended Complaint alleges that plaintiff invented the subject inventions in 1971 and 1988, and that he sent proper notice of these inventions in December 2001 and March 2004; however, he did not file suit until September 2010. According to defendants, plaintiff's claims are subject to Alabama statutes of limitations ranging from two to six years, yet all of his claims accrued more than six years ago. In defendants' view, then, EDC has been fraudulently joined and its citizenship may be disregarded for diversity purposes because Mannsfeld's claims against it are untimely as a matter of law, such that there is no possibility that he can establish viable causes of action against it.

Plaintiff offers multiple rejoinders to this limitations argument; however, the Court need look no further than Mannsfeld's invocation of the so-called "common defense" rule. Numerous

---

[18]     This is true not only for purposes of § 1332's jurisdictional requirements, but also for purposes of statutory removal procedures which do not allow for removal on diversity grounds if any defendant is a citizen of the forum state. *See* 28 U.S.C. § 1441(b) ("Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."). Thus, EDC's Alabama citizenship is problematic under both § 1332 and § 1441(b), and can be overcome only if defendants establish by clear and convincing evidence that there is no possibility Mannsfeld can establish a cause of action against EDC.

federal courts have declined to declare a resident defendant fraudulently joined based on a defense that would apply equally to nonresident and resident defendants alike. *See, e.g., Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 283 (5th Cir. 2007) ("there is no improper joinder if a defense compels the same result for the resident and nonresident defendants, because this would simply mean that the plaintiff's case is ill-founded as to all the defendants") (citations and internal punctuation omitted); *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 575 (5th Cir. 2004) (en banc) (in fraudulent joinder context, "[a] showing that the plaintiff's case is barred as to all defendants is not sufficient. When the only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite showing has not been made."); *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 113 (3rd Cir. 1990) ("we hold that where there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses. Instead, that is a merits determination which must be made by the state court.").[19] The Fifth Circuit set

---

[19]     *See also Dominick's Finer Foods v. Nat. Const. Services, Inc.*, 2010 WL 891321, *3 (C.D. Cal. Mar. 9, 2010) (where fraudulent joinder allegation is actually an attack on merits of plaintiff's entire case as to all defendants, a finding of fraudulent joinder for diversity purposes would be improper because it is a merits-based decision that effectively decides entire case); *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, 692 F. Supp.2d 1025, 1034 (S.D. Ill. 2010) ("the common defense doctrine provides that when the same argument or defense defeats a plaintiff's claim against diverse and non-diverse defendants that argument or defense may not be the basis for a fraudulent joinder finding"); *Feldman v. AXA Equitable Life Ins. Co.*, 2009 WL 2486899, *4 n.6 (S.D. Ga. Aug. 10, 2009) (pursuant to common defense rule, declining to find fraudulent joinder based on statute of limitations defense that would bar claims against resident and non-resident defendants alike); *Loop v. Allianz Life Ins. Co. of North America*, 2009 WL 981988, *5 (S.D. Ala. Apr. 13, 2009) ("when a fraudulent joinder defense would eliminate not only the claims against a single defendant, but … all claims against all defendants, then the common defense rule requires that the federal court reject the fraudulent joinder arguments and remand the removed action back to the State courts for appropriate action"); *Cherry v. AIG Sun America Life Assur. Co.*, 2008 WL 508428, *2 (M.D. Ala. Feb. 21, 2008) ("The common defense rule provides that when a defense to liability is common to diverse and non-diverse defendants, fraudulent joinder cannot be found. … [T]hese attacks on the joinder of the non-diverse defendant are in reality attacks on the merits of the entire case because they undermine the claims against both the diverse and non-diverse defendants."); *Poole v. American Int'l Group, Inc.*, 414 F. Supp.2d 1111, 1117 (M.D. Ala. 2006) (explaining that numerous courts "have applied a 'common defense rule' to fraudulent-joinder (Continued)

forth the logical underpinnings of this rule as follows: "[W]hen, on a motion to remand, a showing that compels a holding that there is no reasonable basis for predicting that state law would allow the plaintiff to recover against the in-state defendant necessarily compels the same result for the nonresident defendant, there is no improper joinder; there is only a lawsuit lacking in merit. In such cases, it makes little sense to single out the in-state defendants as 'sham' defendants and call their joinder improper." *Smallwood*, 385 F.3d at 574.

On its face, the common defense rule would negate defendants' fraudulent joinder argument resting on the statute of limitations defense. After all, nothing in the pleadings or the parties' briefs on the Motion to Remand suggests that defendant EDC is situated any differently from its co-defendants insofar as timeliness is concerned. By all appearances, if Mannsfeld's claims are time-barred as to EDC, then they are also time-barred as to the other defendants and the entire lawsuit would collapse. This is precisely the kind of circumstance in which courts have applied the common defense rule to find no fraudulent joinder. *See, e.g., Gasch*, 491 F.3d at 283 (fraudulent joinder cannot be found "if a defense compels the same result for the resident and nonresident defendants, because this would simply mean that the plaintiff's case is ill-founded as to all the defendants").

In response to Mannsfeld's reliance on the common defense rule, defendants offer three unpersuasive counterarguments. First, defendants state that "the claims against EDC fail for reasons other than the statutes of limitation." (Doc. 24, at 23.) The Court considers those non-limitations bases for fraudulent joinder in Section IV.C., *infra*. While these grounds may indeed

---

claims such that when a defense to liability is common to diverse and non-diverse defendants, fraudulent joinder is not found" for the reason that "common defenses are actually attacks on the merits of the entire case since they undermine the claims against the diverse and non-diverse defendants alike"); *Hauck v. ConocoPhillips Co.*, 2006 WL 1596826, *9 (S.D. Ill. June 6, 2006) ("It is this Court's view that, in every case in which a federal court is asked to find fraudulent joinder on grounds dispositive of the liability of diverse and non-diverse defendants alike, the court is being asked to exercise jurisdiction it does not possess."); *McGinty v. Player*, 396 F. Supp.2d 593, 598, 601 (D. Md. 2005) (applying common defense rule to deem non-diverse defendant not fraudulently joined where limitations defense was equally applicable to claims against diverse defendant); *In re New England Mut. Life Ins. Co. Sales Practices Litigation*, 324 F. Supp.2d 288, 306 (D. Mass. 2004) ("if an argument offered to prove fraudulent joinder of non-diverse defendants also shows that no case exists against the diverse defendants, no legitimate reasons exist to set apart the non-diverse defendants as fraudulently joined").

be unique to EDC (such that the common defense rule would not apply to them), defendants have not carried their heavy burden of proving fraudulent joinder on those non-limitations theories. Second, defendants contend that the common defense rule should not be followed because several judges dissented from the Fifth Circuit's *en banc* opinion in *Smallwood*, one commentator is skeptical of *Smallwood*, and the Eleventh Circuit has not adopted it. However, the cases cited above demonstrate that the common defense rule has been received favorably in numerous federal courts in recent years, and defendants identify not a single federal decision rejecting it. While the Eleventh Circuit appears not to have formally adopted the common defense rule, it has not shunned it either. Besides, lower courts in this District, the Middle District of Alabama and the Southern District of Georgia have all accepted and applied the common defense rule. Certainly, nothing about that rule would conflict with Eleventh Circuit jurisprudence, defendants' inchoate suggestion to the contrary notwithstanding. On this showing, and based on these arguments, the Court will not jettison the common defense rule simply because the *en banc* Fifth Circuit was not unanimous in *Smallwood*, some observers are not enamored of it, and the Eleventh Circuit has not had occasion to consider it.

Third, defendants assert that the common defense rule should not attach here because "[t]he claims against German EDG and Evonik Industries A.G. are not based solely on the improper conduct of EDC." (Doc. 24, at 25.) It is true, of course, that the common defense rule does not apply if the defense at issue does not apply equally to diverse and non-diverse defendants alike. *See, e.g., Adkins v. Duff*, 2004 WL 3103775, *4 (E.D. Ky. Aug. 31, 2004) (finding that common defense rule was inapplicable because "the one year Kentucky statute of limitations is not equally applicable" to the diverse and non-diverse defendants). The problem with this argument is that defendants do not explain how – and the pleadings reveal no reason to believe that – the statute of limitations defense interposed in this case would apply any differently to EDC than to the remaining defendants. Absent any showing that the limitations defense is not equally applicable to all of them, defendants cannot avoid the consequences of the common defense rule through a vague suggestion that Mannsfeld's claims as to the resident and non-resident defendants are somehow materially different for limitations purposes.[20]

---

[20]     A comparison of defendants' statute of limitations arguments pertaining to defendant EDC in briefing the Motion to Remand with their statute of limitations arguments (Continued)

As the issue is framed by the parties in their briefs, then, the common defense rule forecloses defendants' contention that defendant EDC was fraudulently joined because Mannsfeld's claims against it are time-barred. After all, the limitations defense applies equally to diverse and non-diverse defendants in this case, so defendants cannot separate out Mannsfeld's claims against EDC on that basis for jurisdictional purposes. A fraudulent joinder finding by this Court that Mannsfeld's claims against EDC are untimely would effectively scuttle the entire lawsuit, reaching far beyond the narrow jurisdictional question this Court is charged with deciding at this juncture.

### C.     The Non-Diverse Defendant's Status as a Non-Party toEmployment Contract.

In addition to the timeliness defense, defendants insist that EDC is fraudulently joined because it is not a party to the 1964 employment contract on which all of Mannsfeld's claims are predicated. Defendants maintain that EDC's non-party status to that agreement (a fact which they bolster via a pair of declarations by Degussa officials identifying defendant EDG as the successor Degussa entity to which that contract applies) means that it cannot be liable for breaching that contract and that there is no basis for applying ArbEG (the sole theory animating Mannsfeld's claims of ownership of the inventions) to EDC for purposes of ascertaining tort liability. Stated differently, because all of Mannsfeld's claims derive from the notion that EDC used or misappropriated his inventions in contravention of his ownership rights under ArbEG, defendants reason that those claims must fail because EDC never agreed to be bound by ArbEG vis a vis Mannsfeld's inventions. (Doc. 1, ¶¶ 35, 37, 45, 52, 59, 62-64.)[21]

---

pertaining to all defendants in briefing their Motion to Dismiss reinforces the point that the limitations defense invoked here appears uniform as to all three defendants. (*Compare* doc. 8, at 33-38 *with* doc. 1, at ¶¶ 38-40, 42-44, 49-51, 55-57, 65-66.)

[21]     In a variation on this theme, defendants also assert that EDC's status as a non-party to the employment contract means that Mannsfeld's claims against EDC are preempted as a matter of law under the *Bonito Boats* line of authorities. (Doc. 24, at 13-14.) Defendants reason that if there is no contract between Mannsfeld and EDC, then ArbEG cannot determine those parties' rights and obligations concerning the inventions. If ArbEG does not provide the rule of decision and if (as plaintiff insists) federal patent law does not provide that rule of decision either, then, defendants continue, plaintiff must be hanging his hat on state law to establish ownership for all of his tort claims against EDC. According to defendants, any claims to decide inventorship and ownership under state law would be preempted pursuant to *Bonito Boats* as claims for state patent-like protection. To rephrase this argument in fraudulent joinder terms, (Continued)

After careful consideration of the parties' submissions, the undersigned concludes that defendants have not met their heavy burden of establishing that there is no possibility that Mannsfeld can recover against EDC. Several considerations inform this result.[22] First of all, defendants have not explained (and have presented no evidence to explain) the relationship between defendant EDG and EDC. The employment contract states on its face that it is between Mannsfeld and something called "Deutsche Gold- und Silber-Scheideanstalt vormals Roessler." (Doc. 8, Exh. B, at 1.) Defendants do not identify the relationship between that entity and EDC, rendering it impossible to evaluate defendants' conclusory statements of non-party status for what appear to be related corporate entities. Second, defendants' only evidence concerning the

---

defendants' position is that Mannsfeld's claims against EDC have no possibility of success because, in the absence of application of ArbEG, defensive preemption defeats all of those state-law causes of action. Again, the key to this fraudulent joinder argument is that EDC is not bound by the employment contract. If that premise fails, then this entire fraudulent joinder argument collapses because EDC would be subject to ArbEG as to the inventions at issue and no state patent-like protections would be implicated.

[22]    Plaintiff's remand briefs include assertions that it is of no consequence whether EDC is a party to the employment agreement because his Alabama tort claims would entitle him to compensation for EDC's wrongful use of his technology in any event. (*See* doc. 20, at 25, 28.) But this is an oversimplification. To the extent that plaintiff seeks tort damages under Alabama law because EDC misappropriated his inventions, even if ArbEG does not apply, it appears that he is asking for Alabama tort claims to substitute for U.S. patent law. In that event, EDC might have a compelling defense of conflict preemption. *See, e.g., Ultra-Precision*, 411 F.3d at 1382 (unjust enrichment claim subject to conflict preemption where plaintiff "seeks a patent-like remedy for [defendant]'s conduct in making, using, and selling products embodying information [plaintiff] was not successful in protecting under the federal patent laws," such that absent incremental benefits, "any attempt to obtain a patent-like royalty for the making, using, or selling of a product in the public domain under the rubric of state unjust enrichment law is preempted"). Setting aside the preemption defense, the entire moving force of plaintiff's Amended Complaint and briefs is that his ownership right in the inventions derives from application of ArbEG, which governs these inventions only insofar as the parties agreed that it would. If EDC is not bound by the contract, and never agreed that ArbEG would define the parties' respective interests in these inventions, then plaintiff's tort claims in the Amended Complaint would appear doomed against EDC because there would be no pleaded theory under which Mannsfeld would own those inventions vis a vis EDC (as opposed to the contracting defendant(s) who agreed that ArbEG applied). In light of these very substantial concerns, the Court focuses on plaintiff's arguments that EDC is bound by the contract that established ArbEG as the governing law for plaintiff's inventions. Without such a contractual anchor, defendants' conflict preemption and fraudulent joinder arguments become far stronger.

1964 agreement is an unadorned statement that EDC "is not a party to that contract." (Gantzer Decl. (doc. 1, Exh. B), ¶ 7; Bates Decl. (doc. 1, Exh. C), ¶ 3.)[23] Curiously, however, defendants submit a declaration from EDC's President admitting that he is "personally familiar with the employment contract," even as he states that EDC is not a party to it. (Bates Decl., ¶¶ 3-4.) Why would EDC's President be "personally familiar" with a contract that had nothing to do with EDC? Again, defendants leave the question unanswered.

Third, defendants do not explain how, if EDC is not a party to the 1964 employment contract, it has come to utilize and profit from inventions within the ambit of that contract. Indeed, defendants' evidence includes a specific admission that "EDC has made more than $75,000 using the alleged inventions." (Bates Decl., ¶ 6.)[24] It is a well-established general proposition of Alabama law that a stranger to a contract who reaps the benefits of that agreement is likewise bound by its burdens. *See generally Georgia Power Co. v. Partin*, 727 So.2d 2, 5 (Ala. 1998) (beneficiary of a contract "cannot accept the benefits and avoid the burdens or limitations of a contract") (citations omitted). So if EDC is enjoying the benefits of using and profiting from Mannsfeld's inventions pursuant to that contract, then it would appear contrary to Alabama law for it to avoid the burdens of that contract, including the specific provisions that ownership rights in Mannsfeld's inventions were subject to ArbEG. Certainly, if EDG transferred or assigned its interests in those inventions to EDC (which is not clear from the record because defendants do not explain how EDC came to earn more than $75,000 from Mannsfeld's inventions if it was not party to any contract delineating the rights to those inventions), it could not have done so under Alabama law without also transferring the

---

[23] Whether EDC is or is not a party to the contract is as much a question of law as of fact, because it depends on both fact questions (*i.e.*, the relationship between EDC and the contract signatory) and legal questions (*i.e.*, which corporate entities are bound by the contractual obligations of a related entity). A naked statement in a declaration that EDC "is not a party to the contract" abstracts away from these underlying factual and legal principles and asks the Court to accept on faith that the witness's conclusion is warranted by the underlying facts and law, none of which have been presented.

[24] That evidence further establishes that defendant "EDG has made more than $75,000 using the alleged inventions." (Gantzer Decl., ¶ 9.) If, as defendants would have this Court find, EDG is a party to the 1964 contract and EDC is not, then how have they both profited from the inventions within the scope of that agreement? Defendants do not answer that question.

limitations and restrictions on the use of those inventions to EDC. Simply put, EDG could not assign to EDC a greater interest in those inventions than EDG itself possessed. *See, e.g., LPP Mortg., Ltd. v. Boutwell*, 36 So.3d 497, 503 (Ala. 2009) ("Alabama law is long settled that an assignee stands in the shoes of the assignor."); *Singer Asset Finance Co. v. Connecticut General Life Ins. Co.*, 975 So.2d 375, 380 (Ala.Civ.App. 2007) ("When a party assigns its rights under a contract to an assignee, the assignee steps into the shoes of the assignor and possesses all the rights the assignor originally possessed, ***but nothing more***.") (emphasis added). If EDG's rights in Mannsfeld's inventions were subject to ArbEG, then it would seem that any of those rights that EDG transferred to EDC would have been subject to the same limitations.

Fourth, review of the 1964 agreement reveals that it provides on its face that it is "governed by German law." (Doc. 8, Exh. B, ¶ 10.) The Court does not know, because defendants have made no attempt to show, how German law might define the rights and obligations of a corporate entity that is related to or affiliated with a second corporate entity that executed an employment contract with an employee, where the first entity is reaping the economic fruits of that contract.[25] On this record, there is simply no basis for this Court to make any determination that German law would not hold EDC responsible for complying with the terms of the employment contract where (1) it appears to be a related corporate entity to the Degussa entity that executed the agreement; (2) it admits using to its financial advantage Mannsfeld's inventions that fall within the plain terms of that agreement; and (3) EDC's President acknowledges personal familiarity with that agreement. There is nothing in

---

[25] At best, defendants direct the Court's attention to an article entitled "Effects of the German Law on Employees' Inventions when Posting Employees Within the European Union." (Doc. 24, Exh. C.) On its face, this citation is unhelpful because the Amended Complaint does not show that Mannsfeld was posted "within the European Union"; to the contrary, he was posted to the USA. Besides, defendants do not aid their cause by citing generally to a 22-page article, with no pinpoint citations to the specific portion or portions on which they rely. It is not the responsibility of this Court to sift through a lengthy exhibit in hopes of finding some scrap of information that might support a party's position. *See generally* Rule 56(c)(1)(A), Fed.R.Civ.P. (obliging parties to cite to "particular parts of materials in the record" to establish facts for summary judgment analysis). The citation to Rule 56 is not as out of place as it might initially appear, given that defendants themselves have urged this Court to employ a summary judgment-type analysis for purposes of evaluating their fraudulent joinder argument. (*See* doc. 24, at 13.)

defendants' removal papers or brief on the Motion to Remand that might shed light on how German law would allocate contractual duties to EDC given this confluence of facts.[26]

In short, it may or may not be the case that Mannsfeld can prevail on his claims against EDC. It may or may not be the case that EDC's utilization and exploitation of Mannsfeld inventions was covered by and subject to the terms of the 1964 employment agreement, including specifically its provision that ArbEG would govern those inventions. As a factual matter, the record leaves many unanswered questions as to how EDC came to possess those inventions if (as defendants insist) EDC was not a party to the underlying contract. As a legal matter, defendants have not shown to the satisfaction of this Court that there is "no possibility" that the terms of the employment agreement reach EDC merely because another Degussa entity and not EDC signed it. Accordingly, the Court cannot find that EDC (as the non-diverse, resident defendant) is fraudulently joined simply because defendants have presented limited evidence tending to show that it was not a party to the 1964 agreement.[27]

---

[26]     Moreover, plaintiff's filings suggest that German law would treat all of these Degussa entities as a related group for purposes of fixing their rights and responsibilities under the employment agreement. (*See* doc. 20, Exh. B, at ¶¶ 3, 6, 8, 12.) So if defendants' theory is that German law would allow EDC to exploit Mannsfeld's inventions with impunity and without regard to the terms of the employment agreement as long as another Degussa entity and not EDC executed that agreement, such a proposition appears suspect based on the information presented by the parties thus far. The Court declines to conduct a searching investigation of German law in an effort to shore up these identified deficiencies in defendants' jurisdictional arguments and proof pertinent to the Motion to Remand. *See generally Baker v. Norman*, 651 F.2d 1107, 1129 n.26 (5th Cir. 1981) ("[A] district court judge … is neither required nor permitted to become counsel for any party.").

[27]     This same reasoning defeats defendants' related argument that EDC was fraudulently joined because plaintiff's claims against it invoke "patent-like protections" under state law, such that they are defensively preempted pursuant to the *Bonito Boats* line of cases. As the foregoing analysis demonstrates, it cannot be conclusively ruled out that EDC is bound by the employment contract provisions that Mannsfeld's inventions would be governed by ArbEG. As long as there is at least a possibility that Mannsfeld's claims against EDC are subject to ArbEG, those causes of action would not necessarily be preempted. In that scenario, plaintiff's claims against EDC would not properly be characterized as state-law encroachment on U.S. patent law principles, but would simply be enforcing the parties' agreement to adhere to German law in allocating rights and obligations to any inventions that Mannsfeld created during his employment for Degussa.

**V.      Conclusion.**

For all of the foregoing reasons, the Court finds that this matter was improvidently removed and that federal subject-matter jurisdiction is lacking.  In particular, defendants have failed to show federal question jurisdiction because they have not established that federal patent law creates any of plaintiff's causes of action or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law.  Likewise, defendants have not shown diversity jurisdiction because they have not satisfied their heavy burden of proving by clear and convincing evidence that the non-diverse resident defendant, Evonik Degussa Corporation, was fraudulently joined.

Accordingly, the Motion to Remand (doc. 19) is **granted**, and this action is **remanded** to the Circuit Court of Mobile County, Alabama for further proceedings.

DONE and ORDERED this 5th day of January, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE